## In re ELLETSON CO.

(District Court, N. D. West Virginia, November 29, 1909.)

1. BANKRUPTCY (§ 293*)—PLENARY ACTION—JURISDICTION—DEED OF TRUST— VALIDITY.
    Where a bank, claiming security under a deed of trust executed more than four months before the institution of bankruptcy proceedings, voluntarily submitted to the jurisdiction of the bankruptcy court by presenting its claim for adjudication, and the bankrupt's estate was wholly in the possession of the court, the referee had jurisdiction to adjudicate the validity of the deed in a summary proceeding.
    [Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 293.*]

2. COURTS (§ 359*)—FEDERAL COURTS—RULES OF DECISION.
    Whether a deed of trust is valid or not is a local question, in the determination of which the federal courts will follow the decisions of the state court of last resort.
    [Ed. Note.—For other cases, see Courts, Dec. Dig. § 359.*
    Conclusiveness of judgment between federal and state courts, see notes to Kansas City, Ft. S. & M. R. Co. v. Morgan, 21 C. C. A. 478; Union & Planters' Bank v. City of Memphis, 49 C. C. A. 468.]

3. FRAUDULENT CONVEYANCES (§ 9*)—INTENT TO HINDER OR DELAY CREDITORS.
    Under the statute providing for the invalidity of mortgages and trust deeds intended to hinder, delay, or defraud creditors, an intent to do either is sufficient.
    [Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. §§ 10–14; Dec. Dig. § 9.*]

4. FRAUDULENT CONVEYANCES (§§ 9, 271*)—INTENT—BURDEN OF PROOF.
    An intent to hinder, delay, or defraud creditors is to be proven from the facts surrounding the transaction, either from the appearance of the transfer attacked or from evidence aliunde.  If from the latter, the bur den of proof is on the plaintiff.
    [Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. §§ 10–14, 798; Dec. Dig. §§ 9, 271.*]

5. FRAUDULENT CONVEYANCES (§ 138*)—DEED OF TRUST—POSSESSION.
    Prior to December, 1904, E. conducted a printing and stationery business with a paper and printing stock amounting to $4,000.   In that month

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

he sold a one-half interest to C., who was cashier of claimant's bank, for $12,000, of which C. paid $5,000, which he applied to the discharge of E.'s indebtedness to the bank. In January, 1905, a corporation was organized by E. and his brother, and C. and his son, and the bookkeeper, each holding one share of stock, except E., to whom shares of the par value of $49,500 were issued for the business which was transferred to it, worth less than half that amount. C., desiring to withdraw from his contract, it was resolved that the $12,000 return consideration due from E. to C. should be the debt of the corporation and should be evidenced by five notes secured by deeds of trust on all the property of the corporation. This sum was to reimburse C. for the $5,000 he had invested, $3,600 was to discharge an overdraft of the corporation to the bank, and the residue was to be placed to the credit of the corporation in the bank. Both C. and E. participated in such action. Whereupon notes payable at different times were executed, secured by a deed of trust, providing that if the notes were not paid, or if taxes or rent on the plant were not paid, then, on "request or demand" of C., the trustee should sell all the property. The corporation was left in possession for nearly four years, until February 4, 1909, when it was adjudged bankrupt. The first two notes were paid, and $1,000 paid on the fifth. The third was protested for nonpayment November 4, 1904, and the fourth on January 4, 1906. *Held,* that the deed was fraudulent and could not be sustained as security for the bank's debt.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. §§ 438–452; Dec. Dig. § 138.*]

In the matter of the Elletson Company, bankrupts. From an order of the referee holding a deed of trust of certain of the bankrupt's property invalid in part, the trustee petitions for review. Order reversed.

Prior to December, 1904, Will A. Elletson was conducting a business at Parkersburg, West Virginia, under the name of the Elletson Printorium. The scope of this business was general job printing, the manufacture and sale of record and like books, and the purchase and sale of stationery. At the time, in addition to the manufacturing machinery plant, he had a stock in storeroom and in the paper, stock, and printing department of about $4,000. His business was apparently successful, although to an extent indebted, and he was limited in means and credit. In this month of December, 1904, he sold a half interest in this business to E. M. Carver, who was then, and still is, cashier of the Ritchie County Bank, for $12,000. Of this sum Carver paid him $5,000, which he applied to the discharge of indebtedness of the business. In January, 1905, a corporation was chartered by the state known as the Elletson-Carver Company. Its incorporators were Will A. Elletson, E. M. Carver, Edgar Carver, E. B. Elletson, and Bernadine F. Norton, each subscribing one share of the par value of $100, with an authorized capital of $50,000. E. B. Elletson was a brother of Will A. Elletson, Edgar Carver was a son of E. M. Carver, and Miss Norton was the bookkeeper of the Elletson Printorium. These five became the directors of the corporation and were its sole stockholders. Carver manifestly became dissatisfied with his purchase of a half interest in the Printorium business, and, either before or shortly after the formation of the Elletson-Carver corporation, sold back such interest to Will A. Elletson. On January 20, 1905, as shown by its record, this Elletson-Carver Company purchased from Will A. Elletson the entire plant and stock of his Printorium, including its bills receivable, and in payment therefor authorized the issue to him of 495 shares of its stock, the full amount of its authorized capital excepting the five shares subscribed by the original incorporators.

From the date of the organization of the corporation up to February 15, 1905, the amount of stock and supplies was increased by purchases made to about $7,000, so that, on that date, the corporation had as assets $7,000 of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

merchandise, the value of bills receivable, transferred to it from the Printorium, its own bills receivable (the amount of both which are not disclosed), and the manufacturing plant, which included inks, type, and other consumable property. On this 15th day of February, 1905, the stockholders held a meeting, notice of which was waived by all, and at which all were present. A resolution was then passed setting forth that the company was indebted to E. M. Carver in the sum of $12,000, and authorizing the president of the company, Will A. Elletson, to execute promissory notes therefor and secure the same by deed of trust upon all the company's property, plant, furniture, fixtures, and lease. The directors, who were the same individuals as the stockholders, immediately met and ratified the stockholders' action, and thereupon five negotiable notes were executed by this company, by Will A. Elletson, its president, all dated at Parkersburg, W. Va., on this February 15, 1905, all made payable at the Ritchie County Bank to the order of Will A. Elletson and indorsed by him. The first four were for $2,500 each, the fifth for $2,000. They were made payable on the 1st days of June, September, November, 1905, and of January and March, 1906, respectively. To secure the payment of these notes to E. M. Carver, a deed of trust was executed on this same day by the company, acting by its president, Elletson, whereby it conveyed to George H. Carver, trustee (a brother of E. M. Carver), "every and all appliances, attachments, furniture, fixtures and machinery of all kinds and character, together with the attachments thereof and every part of the equipment, furnishings and fixtures used in and about the conducting of the business known as the Elletson-Carver Company, now in or upon the premises, together with all the accounts then due the Elletson-Carver Company as assignee of the Elletson Printorium, Will A. Elletson, proprietor, it being all the property of every kind, character and description, together with the books, accounts, lease, furniture, fixtures and stock now on hand of the said the Elletson-Carver Company."

It is stipulated in this trust deed that if the company should default in the payment of the notes or any one of them when due, should fail to pay the taxes or rent due, or fail to keep the property insured for at least $12,000, then, upon "request" or "demand" of E. M. Carver, the trustee should sell all the property for cash.

It is not controverted that, of this $12,000 so secured, $5,000 was to reimburse E. M. Carver the sum he had paid Elletson upon his purchase of a half interest in his Printorium, $3,600 was to discharge an overdraft which the Elletson-Carver Company had been permitted to make in the Ritchie County Bank, and the residue was to be placed to the credit of the company in this bank. At the time this trust was authorized and executed, Will A. Elletson was president, E. M. Carver, vice president, and Edgar Carver, secretary and treasurer, of the company, and all three participated in these transactions both as stockholders and directors. At the same meeting of the directors a resolution was adopted setting forth that Edgar Carver, the secretary and treasurer, would be absent for a time, and that therefore, until the next meeting, Elletson, president, should be empowered to carry on the business of the company with power to execute and indorse promissory notes, sign checks, drafts, and vouchers for the payment of any and all indebtedness of the company.

Of the five notes, it appears that the first two were paid in full and $1,000 was paid upon the fifth and last one. The third one was protested for nonpayment November 1, 1905, the fourth one on January 2, 1906, and as to the fifth one, with the credit of $1,000 indorsed thereon, protest was waived by Elletson, the indorser.

In this condition of things, from the date of this trust deed, February 15, 1905, up to the 4th of February, 1909, nearly four years, this corporation, which by resolution under the West Virginia statute changed its name to the Elletson Company, under the management and control of Will A. Elletson, its president, remained in full and undisturbed possession of all the property conveyed by the trust and proceeded to carry on its business of manufacturing blank and record books, of job printing, and selling stationery. To this end it sold, without let or hindrance from Carver or any one else, the consumable stock on hand included in the trust and purchased and sold some

$29,000 of new stock of like nature, except about $1,500 worth of it on hand. A fire occurred during this period that damaged near $1,300 of the machinery in the manufacturing plant, a total of $2,600 insurance money was collected and used, and some $3,000 worth of new machinery was installed. On February 4, 1909, this company was adjudged bankrupt. R. L. McFarland was appointed trustee. He has listed the assets to be something over $22,000, and the liabilities over $34,000.

Before the referee to whom the matter was referred, the Ritchie County Bank has appeared and filed proof of claim for $9,960.37, $3,500 of which is not in controversy here, the remaining $6,400 based upon the three unpaid notes secured to Carver by the trust deed and which the bank claims to be the owner of. To the claim of the bank that this sum is a secured claim by reason of the trust deed and first payable out of the assets of the company, the trustee has filed before the referee a protest, and the bank, E. M. Carver, and G. H. Carver, trustee, have filed replications thereto.

The referee has held the deed of trust to be valid as to all the property conveyed therein except the stock of goods in the stationery and binding departments. To this ruling the trustee has excepted, and, at his instance, the question has been certified for review.

Smith D. Turner, Reese Blizzard, John Marshall, and Merrick & Smith, for trustee and unsecured creditors.

Dorr Casto and Robinson & Prunty, for Carver and Ritchie County Bank.

DAYTON, District Judge (after stating the facts as above). Is the deed of trust of February 15, 1905, void as a security for the bank's debt by reason of its disclosing on its face an intention and purpose to hinder, delay, and defraud creditors of the bankrupt company, or by reason of such intention being shown by evidence aliunde? This deed having been executed more than four months prior to the institution of bankruptcy proceedings, under older decisions some doubt might have arisen as to the right of the referee to pass upon and adjudicate the matter in this summary proceeding instead of requiring the institution of a plenary suit for the purpose. The bank, however, having voluntarily submitted to the jurisdiction by presenting its claim for adjudication, and the estate of the bankrupt being wholly in the possession of the court, there can no longer be doubt of the jurisdiction as thus taken by the referee under the rulings of such cases as White v. Schloerb. 178 U. S. 542, 20 Sup. Ct. 1007, 44 L. Ed. 1183, and Whitney v. Wenman, 198 U. S. 539, 25 Sup. Ct. 778, 49 L. Ed. 1157.

The Supreme Court has also determined that the question of whether such a deed of trust is valid or not is a local one and must be governed by the state court decisions which the federal courts will follow. Thompson v. Fairbanks, 196 U. S. 516, 25 Sup. Ct. 306, 49 L. Ed. 577; Humphrey v. Tatman, 198 U. S. 91, 25 Sup. Ct. 567, 49 L. Ed. 956.

Turning to the West Virginia cases, we find that the Supreme Court of Appeals of the state, so recently as March last, has reviewed the question here involved in the case of Gilbert v. Peppers, 65 W. Va. 355, 64 S. E. 361. The facts there were, substantially, that Darkey sold his stock of goods to Peppers, took a deed of trust from him to secure 36 purchase-money notes payable one each month thereafter, allowed him to take charge of the goods, sell a part thereof, incur indebtedness, then had the trustee take charge of the store and adver-

tise the same for sale. At the instance of creditors, a receiver was appointed, who sold the goods, keeping separate account of the proceeds arising from the sale of those originally sold by Darkey to Peppers and those arising from the sale of new stock since purchased by Peppers. This deed of trust was assailed as being fraudulent and void per se. It was so held by the court below. The Supreme Court of Appeals, reviewing this ruling and affirming it, points out that, under the West Virginia statute, all deeds of trust on stocks of mercantile goods, allowing the debtor to remain in possession, sell, and dispose of the same, until recently, had been held to be fraudulent and void per se (citing Shattuck v. Knight, 25 W. Va. 590; Klee v. Reitzenberger, 23 W. Va. 749; Livesay's Ex'r v. Beard, 22 W. Va. 585; Claflin v. Foley, 22 W. Va. 434; Garden v. Bodwing's Adm'x, 9 W. Va. 121; Kuhn v. Mack, 4 W. Va. 186); that this ruling is sustained by the decisions in the states of Alabama, Colorado, Connecticut, Delaware, District of Columbia, Florida, Idaho, Illinois, Kansas, Massachusetts, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, Ohio, Oklahoma, South Carolina, Tennessee, Texas, Virginia, and Wisconsin; that in Arkansas, New Jersey, North Carolina, South Dakota, and Vermont such trusts are held to be presumptively, not conclusively, fraudulent, while in Kentucky, Maine, Michigan, North Dakota, and Rhode Island there is no presumption either way, the question being submitted to the determination of a jury as a question of fact; that such mortgages are in California prohibited by statute, in Georgia legalized, while the statute of Iowa is peculiar and exceptional. This court then points out that after enforcing its rule for many years, by the cases of Conaway v. Stealey, 44 W. Va. 163, 28 S. E. 793, Horner-Gaylord Co. v. Fawcett, 50 W. Va. 487, 40 S. E. 564, 57 L. R. A. 869, and Bartles & Dillon v. Dodd, 56 W. Va. 383, 49 S. E. 414, an exception was established by it in favor of a purchase-money debt secured upon the property purchased, where there were no existing creditors who could be prejudiced, or against whom fraud could have been directed, and where the deed of trust was recorded and notice thereof was thereby given subsequent creditors. This case then, after full discussion and review of these cases, expressly disavows the soundness of this exception and in terms overrules the cases of Conaway v. Stealey and Horner-Gaylord Co. v. Fawcett. In regard to the case of Bartles & Dillon v. Dodd, the court says, it "may possibly be sustained on principle, as the property, except a small portion thereof, was not consumable in its use, nor perishable, nor intended to be sold."

Notwithstanding I might disagree with the reasoning of this case, I would, as hereinbefore indicated, be compelled to follow it. It is the last enunciation of the Supreme Court of Appeals of the state construing a local contract and a local statute. But I do not disagree; on the contrary, I am in full accord in judgment with it. As well said by Judge Poffenbarger:

"A failing merchant, or a solvent one having a store in a bad place, would be required to do no more, in order to profit at the expense of wholesale dealers, than make a pretended sale to an irresponsible party on credit, at any

price they may see fit to adopt, and take such a deed of trust on the stock * * * and let the store continue to operate under it as long as the pretended purchaser can obtain credit."

The illegality of such conveyances under our statute does not turn upon the validity of the debt secured, but upon the intent of the grantor thereby to hinder, delay, and defraud other creditors either existing or subsequent. The intent may not be to actually cheat and defraud; it is enough if it be to hinder and delay. A debtor may honestly believe that by making such conveyance of personal property he will be able to continue in business and in time work out of it a profit sufficient to pay all debts existing and that may be incurred in accomplishing this purpose. The favored creditor, to be so secured, may share in this view and be willing to sell his property on long time thus secured, in order to allow the experiment to be tried. But it is not sound morality or good law to allow these two to determine the rights of others, or to hinder or delay those others in the enforcement of their rights.

The statute is in the disjunctive; therefore either intent is sufficient. This intent is to be proven from the facts surrounding the transaction. These facts may appear upon the face of the deed or from evidence aliunde. If they appear aliunde, the obligation is upon the plaintiff to prove them. These propositions are clearly sustained by a long line of West Virginia decisions, among which are: Edgell v. Smith, 50 W. Va. 349, 356, 40 S. E. 402; Goshorn's Ex'r v. Snodgrass, 17 W. Va. 717; Landeman v. Wilson, 29 W. Va. 702, 720, 2 S. E. 203; Knight v. Nease, 53 W. Va. 51, 44 S. E. 414; Butler v. Thompson, 45 W. Va. 660, 31 S. E. 960, 72 Am. St. Rep. 838; Hutchinson v. Boltz, 35 W. Va. 754, 14 S. E. 267.

In the case before us, the deed of trust is assailed as being both fraudulent on its face and in fact. It is not necessary to consider these two charges separately. There is no difference in effect between the two. Rather let us consider the conditions, as a whole, existing at the time this trust deed was executed. Elletson owned the business personally. He was to some extent indebted. He induced Carver to buy a half interest at $12,000 and pay down $5,000. Carver soon became dissatisfied and refused to pay the balance of $7,000. He wanted to rue the contract, get out of the payment of the $7,000, and secure repayment to him of the $5,000. Elletson had paid out the $5,000 on his debts, and therefore could not repay it to Carver; besides the $7,000 was absolutely necessary to the continuing of the business because Elletson, upon the strength of Carver's agreement to pay it, had bought additional stock and overdrawn some $3,600 in the Ritchie County Bank, of which Carver was cashier, and which overdraft Carver had permitted to be made. What was the problem to be solved by these men under these conditions?

Is it not clear that, on Carver's part, it was to get a rescission of his contract of purchase, a repayment of his $5,000, and of the overdraft in his bank? Is it not also clear that, on Elletson's part, it was to be able to continue the business without litigation and secure the additional capital necessary to do this? What was more natural than that Carver, seeing his absolute inability to secure in cash the $5,000

to himself and the $3,600 to his bank, should think of the next best thing, that of "securing" himself somehow? What more natural than that Elletson should be glad and quick to accede to any proposition that would enable him to continue the business without embarrassment and obtain the needed additional capital? Do not the facts inevitably point to these purposes—to secure Carver, to enable Elletson to continue the business? Elletson bought Carver's half interest back. They formed a close "family" corporation of just five, the lowest number the law allowed, Elletson and his brother, Carver and his son, the bookkeeper of Elletson, becoming the sole stockholders, each holding one share. Elletson then sells the business to the corporation for 495 shares of capital stock, par value of $49,500, more than double what the property was likely worth, for he had sold to Carver and just bought back a half interest therein for $12,000. Then the five stockholders, as such and as directors, hold a meeting and resolve that the $12,000 due from Elletson to Carver is the debt of the corporation and shall be secured by the execution of five negotiable notes, and this deed of trust. Carver and Elletson participated in this action of stockholders and directors, in which they were both so deeply interested—a fact in itself rendering the deed of trust executed in accord therewith liable to be viewed with suspicion and jealousy, as held in Hope v. Salt Co., 25 W. Va. 789, and Sweeny v. Sugar Refining Co., 30 W. Va. 443, 4 S. E. 431, 8 Am. St. Rep. 88. The deed of trust is drawn in minute detail setting forth hundreds of articles of personal property, very many of perishable and consumable character, and including all books, accounts, bills receivable, and the lease for the building. So far it might have been legal, if it had required the trustee therein to take possession of the goods and sell them to pay the debt. Such, however, was not the purpose. The company was to remain in possession until default was made in the payment of the notes, or some one of them, when due, and then the trustee was to take and sell only at the request of Carver. The directors resolved, Carver participating, that in the meanwhile Elletson should conduct the business, incur liabilities, and discharge them.

Was not the purpose to thus withdraw this property from being liable to any other creditor of the company, keep it together for an indefinite period as a security for Carver's debt, and yet let Elletson under the company's name use it, sell it, wear it out, exchange it, upon condition that the profit of the business derived from such use, sale, wear, and exchange of it should go to the liquidation of Carver's debt? A single undisputed fact, it seems to me, proves this beyond all controversy. The notes became due on the first days of June, September, November, January, and March following. While the first two seem to have been paid, the third one, becoming due in November, was not paid. It was apparently then in the custody of the bank, for it caused it to be protested. Carver was cashier of the bank all this time. He was also vice president of the Elletson corporation all this time. He knew the condition of the company, the perishable character of the property covered by this trust, yet for the whole period from November, 1905, to February 4, 1909, when the company became bankrupt,

174 F.—55

three years and three months, no request came from either Carver or the bank to enforce this trust! And again in January, 1906, when the fourth note became due, default was made, protest was had,. and no taking possession or sale was required. The conclusion is inevitable that this trust was not to be enforced as long as it could hold together the property and shield . the business from attack by other creditors. That the bank and Carver fully understood and participated in this purpose is established by this delay and the connection and association the one with the other.

But, finally, it is insisted that this case comes within the ruling in Bartles & Dillon v. Dodd, supra, which Judge Poffenbarger, in Gilbert v. Peppers, says might "possibly" be sustained on principle because so small part of the property involved was consumable in its use or perishable or intended to be sold. I do not think this position can be maintained here, for three reasons: First. Because I do not think the decision in Bartles & Dillon v. Dodd can possibly be maintained in principle for the reason stated. On the contrary, I think it in direct conflict with the true principles established by very many older cases (such as Shattuck v. Knight, 25 W. Va. 590, 600; Landeman v. Wilson, 29 W. Va. 702, 2 S. E. 203; Livesay's Ex'r v. Beard, 22 W. Va. 585; Claflin v. Foley, 22 W. Va. 434, 441; Gardner v. Johnston, 9 W. Va. 403) to which the ruling in Gilbert v. Peppers directly takes us back, as also with those directly established by this Gilbert Case itself. Second. If this be not so, and the Bartles Case can be distinguished and upheld, in my judgment it is not applicable here where no small portion of the property conveyed was consumable in its use, perishable, or intended to be sold, but where, on the contrary, near $7,000 worth of the property so conveyed was of this character. Third. In the Bartles Case the trust deed was only assailed as being fraudulent on its face. Here the trust deed is not only assailed for this reason, but also because it is fraudulent in fact, and, as I have indicated, I think the facts disclosed clearly show it to be so, made as it was to hinder and delay creditors from interfering with this property while the company carried on business with it for years.

The decision of the referee must be reversed, and the trust deed, as a security for the bank's debt, must be held wholly null and void.