## In re SCHOENFIELD.

### (District Court, N. D. West Virginia. July 27. 1911.)

1. BANKRUPTCY (§ 184*)—CLAIMS BY THIRD PERSONS—DETERMINATION.
   A receiver in bankruptcy properly took possession of a stock of goods which remained under the bankrupt's control and was being disposed of, though a bill of sale to claimant had been recorded, it not complying with the bulk sales law of the state; and the bankruptcy court has jurisdiction to determine claimant's rights.
   [Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 184.*]

2. CORPORATIONS (§ 312*)—PRESIDENT—POWERS.
   The president of a corporation cannot transfer title to goods to himself without the directors' consent, and one not an innocent purchaser from him takes nothing by his purchase from the president.
   [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1376–1386; Dec. Dig. § 312.*]

3. BANKRUPTCY (§ 303*)—FRAUDULENT TRANSFER—EVIDENCE.
   Evidence on a claim to property taken as belonging to a bankrupt *held* to show that an attempted transfer to claimant was intended to defraud the other creditors.
   [Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 303.*]

4. ESTOPPEL (§ 59*)—WHO MAY ASSERT—PARTIES TO FRAUD.
   One party to a scheme to defraud creditors cannot base estoppel upon another's acts under the scheme.
   [Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 146, 147; Dec. Dig. § 59.*]

5. BANKRUPTCY (§ 303*)—ASSETS—PROOF.
   On a claim of property taken as belonging to a bankrupt, the trustee in bankruptcy need not show insufficient assets in his hands to satisfy creditors when the bankrupt states in his petition that he has no assets.
   [Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 303.*]

In the matter of Herman Schoenfield, bankrupt. On petition by Jacob Salsburg claiming certain property. Petition dismissed.

Upon hearing of petition of Jacob Salsburg, asserting title to property taken possession of by trustee, the following certificate of facts was made by Referee J. W. Cummins:

On June 14, 1910, Herman Schoenfield filed a voluntary petition in bankruptcy, scheduling no assets, but showing a liability of $14,000. On the 15th day of June, 1910, there was an adjudication, and an order of reference to J. W. Cummins, referee. On the 23d day of June, 1910, a petition was filed by S. M. Noyes, asking for the appointment of a receiver, and thereupon George A. Blackford was appointed receiver, and as such took immediate possession of the store and property therein at No. 1128 Market street, in the city of Wheeling, W. Va., known as the "Schoenfield Store." On June 27, 1910, at the first meeting of creditors, the said receiver was duly elected and qualified as trustee, and thereupon he proceeded to Bay City, Mich., and took charge of the store there, most of the goods of which had been shipped from the Wheeling store, after Herman Schoenfield had been adjudicated a bankrupt.

On June 27, 1910, Jacob Salsburg, by his attorneys, filed a petition before the referee, claiming to be the owner and to be in possession of the goods at the store in Wheeling, No. 1128 Market street, and prayed that the receiver and trustee, George A. Blackford, be directed to deliver the possession thereof to the said Jacob Salsburg. The referee decided against the prayer of the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

petition, and a review of his order was asked by the said Jacob Salsburg. Thereupon the matter was certified to the Honorable Alston G. Dayton, Judge. and by an order entered on the 20th day of July, 1910, he confirmed the order of the said Cummins, referee, and decreed that the petition filed by the said Jacob Salsburg be taken, deemed, and treated as an intervening petition for the purpose of trying the title and the right to the possession of said property, and referred the hearing on said petition and the answer thereto filed by the said George A. Blackford, trustee, to J. W. Cummins, referee. The referee proceeded with said hearing, and after hearing all the testimony introduced by the said Jacob Salsburg, and also by the said George A. Blackford, trustee, and the arguments of counsel, did on September 30, 1910, enter an order, the original of which is annexed to this certificate. On the 30th day of September, 1910, in said proceeding, Jacob Salsburg, feeling aggrieved thereat, asked for a review of aforesaid order, which was granted.

A summary of the evidence on which such order was based is as follows:

That Herman Schoenfield, bankrupt, is 41 years old; was born in Germany; is now a citizen of the United States, and has lived in the United States between 21 and 23 years; is single; has one brother living in this country, Max Phillip Schoenfield, who is now about 30 years of age, who has been here about 10 years, and now lives in Wheeling, and is a salesman at present. When Herman Schoenfield came to this country, he had no means, that Herman Schoenfield went into business with an uncle in Pittsburg, under the name of the "Lion Clothing House," Herman Schoenfield taking the lease in his own name, the rent reserved being $900, conducting this business for about a year, when he broke up and lost every dollar he had. That after Herman lost his money in the Lion Clothing Company in Pittsburg, his uncle had the goods shipped to Johnstown, Pa., where some new goods were added to the old stock, the business being conducted in the name of "Chicago Clothing Bankrupt Sale" for about one year. The lease on the property in Johnstown was taken in Herman's name, the rental being $1,200 a year. The uncle, owner of the store, got into trouble, and the sheriff came and closed the store. The store was advertised under the name of the Chicago Clothing Bankrupt Company to attract people to the store. The goods were advertised by bankrupt sales, as Herman has done right along. Herman Schoenfield had no interest in the business at Johnstown, except his salary, which ranged from not less than $25 to not more than $30 a week. This store at Johnstown was conducted about 18 or 20 years ago.

The stock of goods at Johnstown, when it was sold at sheriff's sale, was bought back by a relative, Israel Schoenfield, an uncle of Herman Schoenfield, and shipped to Shelby, Ohio. Herman was retained as manager of this store at Shelby, Ohio, which lasted about three months; Herman's salary being $40 a week; the store being conducted under the name of the International Clothing Company. A bankrupt sale was had in connection with the store at Shelby, Ohio. At the expiration of about three months, the goods were shipped up to Mansfield, Ohio, and went into a store opened up by Israel Schoenfield, the uncle of Herman Schoenfield. When this store was opened up a bankruptcy sale was advertised. Herman was manager, at a salary of about $30 a week, and lived at the home of the proprietor, his uncle, free. Herman stayed at Mansfield over a year, and left there about 1897, not having a dollar. He then formed a partnership with a cousin, Samuel Steinfeld, who furnished the money, $4,250, to buy a stock of goods at New Castle, Pa., which store was called the "International Clothing Company," Herman's interest being to draw a living and one-half the profit. The store made money. Herman was the man in charge of the store, being connected with it for 11 months, Herman getting out of the store during that time his living and $3,500 worth in goods, and went to Sharon, Pa., and opened a clothing store as Herman Schoenfield, being the first time that he started in business alone. In addition to the $3,500 worth of goods which Herman brought from New Castle, as his share of the profits, a stock of other goods was added. This store continued for about two years, and Herman moved to Youngstown, Ohio. At Sharon, Pa., a fire destroyed the store of Herman Schoenfield. When the store was opened in Youngstown, Ohio, one Seligson

was taken in, the store being under the firm name of Schoenfield & Seligson. In a short time Seligson was bought out. At Youngstown, Herman Schoenfield went into bankruptcy, owing about $50,000. The creditors received 20 per cent. Herman Schoenfield applied for his discharge in the bankruptcy proceedings at Youngstown. Specifications were filed in opposition to the discharge by a number of the creditors, alleging among other grounds that the bankrupt had not kept books of account, and that he had falsely and fraudulently concealed his assets and had not given up all his property. The hearing on the specifications in opposition to the discharge was referred to a referee, who found that Herman Schoenfield had not surrendered all of his property and had made false and fraudulent statements concerning same, finding in favor of every specification, and recommended that the bankrupt be not discharged. This finding was sustained by Justice Wing, then judge of the District Court, and the discharge of Herman refused.

While Herman Schoenfield was in business at Youngstown, his brother, Max Schoenfield, who was then about 20 years of age, came from Germany, and worked in the capacity of clerk in Herman's store. After the bankruptcy of Herman Schoenfield at Youngstown, Herman being an undischarged bankrupt, he went into business at Homestead, Pa., in his brother's (Max Schoenfield's) name. Max had saved about $500 or $600 from his salary, which he earned as a clerk in his brother's store at Youngstown. The store was a success, and was continued in this way for three or four years, when the Pennsylvania corporation of the Schoenfield Company was formed, about 1904, most of the stock appearing in the name of Max Schoenfield, and Phillip Schoenfield, the father of Max and Herman Schoenfield, a small portion of it in the name of Herman. This corporation having taken over the business which Herman was theretofore conducting in the name of Max Phillip Schoenfield, his brother. Max Phillip Schoenfield was president of this corporation, and Herman secretary and treasurer. The first time the board of directors met, they authorized a salary to Herman Schoenfield of $3,000 a year. No one else connected with it was authorized a salary from the stockholders or board of directors. No dividends were ever declared. The minutes of the company are very informal and irregular. Jacob Salsburg was the second man that Herman met when he came to this country. The Schoenfield Company was in business at Homestead, Pa., and continued their business at Wheeling, W. Va., down to about July, 1909, when it went into bankruptcy. The Schoenfield Company opened their store in Wheeling at No. 1128 Market street, in January, 1908. In March or April, 1909, Herman Schoenfield rented a storeroom in Pittsburg, from McCann & Co., and went into business there, his brother Max having charge of the business.

The Schoenfield Company and Herman Schoenfield gave fictitious and fraudulent cognovit notes to Shoeneman & Salsburg, which were used to close up the business, and then re-open and advertise a sheriff's sale, instances of which are at McKeesport and Columbus, Ohio. There is no evidence of any of these false or fraudulent notes ever being given in anybody's name except Shoeneman & Salsburg.

The three creditors who filed the bankruptcy petition in the Schoenfield Company bankruptcy proceedings were Woodbine Children's Clothing Company, a partnership owned by Jacob Salsburg, Joseph Shoeneman, and an individual by the name of ———— Rabinovitch; a partnership by the name of Shoeneman & Salsburg, composed of Joseph Shoeneman and Jacob Salsburg, which was a discontinued business at the time of the bankruptcy proceedings, having gone out of business in 1907; Goorin & Shapira Company —all of those being very close friends of Herman Schoenfield. Herman admits that up until the 26th day of April, 1908, he drew out of the Schoenfield Company, as salary, about $12,000. Most of this money he says he sent to his sisters in the old country. He cites an instance in June or July, of 1909, where he bought a draft from the German National Bank in Allegheny, Pa., giving as a consideration for said draft, a check on his account in that bank, which account was in the name of Max Schoenfield, which he sent to Germany. The liabilities of the Schoenfield Company, when they went into bankruptcy, were about $50,000. Herman Schoenfield and his brother, Max,

got along well socially, but there was some kind of misunderstanding in business, and this was the reason why the Schoenfield Company, part of the time, had more than one store. The Schoenfield Company was not paying its bills promptly, and in February, 1909, there was a meeting of their creditors at Philadelphia. Jacob Salsburg was at this meeting, and Herman Schoenfield, as well as the other creditors of the Schoenfield Company. Max was not at the meeting. The Schoenfield Company was put on an extension list at this meeting, some of the notes not maturing for 30 months from that time. On July 28, 1909, Jacob Salsburg went to Pittsburg, and obtained from Max Schoenfield two agreements, by which he guaranteed to pay the claims which Shoeneman & Salsburg and Woodbine Children's Clothing Company had against the Schoenfield Company, amounting to about $14,000. At this meeting Herman Schoenfield was present. Jacob Salsburg says he does not remember anything about what occurred at this time, suffering a very sudden lapse of memory, which is significant. Max Schoenfield, in the first examination, which was a part of the examination of the bankrupt, gives as the reason why he made the agreements, that using his language: "I done that because Mr. Salsburg, being a friend of mine, also extended me liberal credit from time to time; I felt this way, if I would get the stock, all the assets of the Schoenfield Company, I figured I would get the stock and all their assets, and I figured then I would pay him so much money."

I find from all the facts and circumstances in the case that Herman Schoenfield and Jacob Salsburg, at this time, had arranged for the bankruptcy of the Schoenfield Company, said Salsburg was to use his influence with other creditors to bring about a composition at 20 cents on the dollar. In the early part of July, following, the bankruptcy petition was filed and the Schoenfield Company adjudicated a bankrupt. There was an agreement in writing, signed by a number of the creditors, authorizing Herman to close up the business, and agreeing to accept 20 cents on the dollar. This composition was made, and a loan was made to Herman Schoenfield of $6,000 less the discount, by Shoeneman & Salsburg, through Jacob Salsburg.

At the time of the bankruptcy, the goods of the Schoenfield Company were in their store at Wheeling, 1128 Market street. After the composition, the store was opened and continued to do business until June 23, 1910, when the store was seized by George A. Blackford, receiver in bankruptcy. The Schoenfield Company had a bank account at Homestead, Pa., up until the company went into bankruptcy, and it did not have an account at any other bank. Herman Schoenfield closed up the store which he had in Pittsburg, which was being conducted by Max, his brother, in August, 1910. The money derived from the sale of goods from this store was deposited in the German National Bank of Allegheny in Max's name. When the store was discontinued in Pittsburg, the money in the bank was checked out, and the goods and the money, as well, taken to Chillicothe, Ohio, where Herman opened another store in his brother's (Max Phillip Schoenfield's) name. He also opened a bank account in a bank in Chillicothe, Ohio, in the name of his brother, Max Phillip Schoenfield, the store at Chillicothe being managed by Max Phillip Schoenfield.

Herman had a bank account in the German Bank of Wheeling, in his own name, which was a very active account. He also had a bank account in the Security Trust Company, at Wheeling, in his own name; also had a bank account in the National Exchange Bank, in the name of his brother, Max Phillip. Herman's store at Chillicothe was moved to Bay City, Mich, about the first of the year 1909, and continued until about May of the same year. The bank account there was in Herman's name. He had the goods at Bay City insured in his own name. When the store at Bay City was closed out, Herman came back to Wheeling, and he and Max were both at the Wheeling store, No. 1128 Market street. During the time Max was at Pittsburg and also at Chillicothe, the book entries were partly in Max's own handwriting, and partly in the handwriting of the clerk, and show that he drew a weekly salary as clerk, the same as the other clerks. The money, except about $135, that was used to make the composition of the Schoenfield Company, came from the bank account at Chillicothe, which was in Max Schoenfield's name.

The books kept at the store in Chillicothe, Ohio, show that when the check drawn by Max Phillip Schoenfield was sent to Pittsburg to Sachs & Hirshfield, to make the composition, an entry was made on Herman Schoenfield's personal account, charging this amount of money to Herman. The additional $135 was made good in Pittsburg, by the check of Jacob Salsburg, which was afterward repaid to Jacob Salsburg by Herman Schoenfield.

Several weeks before June 2, 1910, the date of the bill of sale to Jacob Salsburg, Herman and Max had a quarrel in the store at Wheeling. Max immediately left the store, and did not return to work until after the transfer to Jacob Salsburg. During this time he had made arrangements to go to Europe. Salsburg came to Wheeling in June, 1910, in response to letters and telegrams of Herman's, of which Max was ignorant. Herman Schoenfield listed all of the accounts which were assumed in the bill of sale, which part of the bill of sale is by far the most material part, and is in the handwriting of Herman. After Jacob Salsburg returned to Philadelphia, the bill of sale was admitted to record. There was also returned to Herman a contract of employment, signed by Jacob Salsburg. Very shortly after the 2d of June, a large quantity of the goods at 1128 Market street was shipped to Bay City, Mich., and a store opened there. No bank account was opened at Bay City, Mich., until after the 27th of June, at that time Herman Schoenfield sending a telegram to Wilkins, the manager there, to open a bank account in the name of Jacob Salsburg, and send the book to B. Salsburg, P. O. Box 436, Wheeling. This was Herman's P. O. Box, and this telegram was sent after George A. Blackford had taken possession of the store at Wheeling. Jacob Salsburg did not open an account at Wheeling, but the proceeds of the sales from the store at Wheeling were deposited in the same bank accounts the same as they had been before the bill of sale to Jacob Salsburg.

Herman Schoenfield advertised a sale of goods at the store in Wheeling after he became bankrupt, as the goods of Herman Schoenfield, calling particular attention in the advertisement to the court; and the time when he was adjudicated a bankrupt. This advertisement does not bear the name of Salsburg, nor does it in any way show that Salsburg had any interest in the store, although it was long after the bill of sale, and Salsburg says he knew nothing about this advertisement at the time. The store at Wheeling No. 1128 Market street, contained, across the front thereof, in large letters, the word, "Schoenfield" and the words, "Schoenfield" and "Schoenfield's Store" were displayed on muslin signs in front of the store, and at other conspicuous places in the store. The signs were not changed after the bill of sale to Salsburg, and everything remained just as it was before the bill of sale, and that was the condition when the receiver, Blackford, took charge of the store at Wheeling.

At the time the bill of sale was made, Jacob Salsburg gave his check to Max Phillip Schoenfield for $1,076. By this bill of sale, made by Max Phillip Schoenfield to Jacob Salsburg, Jacob Salsburg bases his title, and it is the only title or claim of title that he claims or makes. Max deposited this check for $1,076 in the German Bank of Wheeling, opening an account in that bank, this item being the only deposit ever made in that account. At the time an account was in his name in the National Exchange Bank at Wheeling, and he gives no reason why this money was not deposited in the account in his name in the National Exchange Bank. Of this $1,076 he immediately checked to Herman $76; afterwards checks to himself $10, then draws a check on the account for $990, thereby checking out the entire $1,076.

The bill of sale recites that Jacob Salsburg is to assume certain accounts as a part of the consideration. He has not paid any of these accounts, and none of the accounts have been paid except one account of about $150 for the payment of which a check was outstanding at the time the bill of sale was given, and which check was met at the bank in Wheeling out of the money which was taken from the sales of the goods; another check being for about $26 was drawn on the account in Bay City and payment thereon was stopped by the receiver. Herman Schoenfield gave a number of fake notes and

fake checks during his business career, the kiting of checks being the rule
with him, rather than the exception.

A number of the books of the Schoenfield Company, showing the accounts
at the different stores, were introduced. Some of these books were
mutilated, at the places where the accounts of the Schoenfields would appear,
as indicated by the index. Some of these books were not discovered by the
trustee until after Max Schoenfield, Herman, and Jacob Salsburg had gone
into the store for the purpose of an inventory after possession had been taken
by the receiver. The goods at Wheeling were insured by three policies of
insurance in the name of Jacob Salsburg, after the bill of sale. Prior to the
bill of sale to Salsburg, a number of applications for insurance on the goods
at the store in Wheeling were made, but in practically every instance the
insurance was refused or canceled. The premiums were promptly paid, and
the building in which these goods were, was a modern brick building on
Market street, one of the principal business streets in Wheeling. Many of
the contracts for advertisement with the various newspapers were made in the
name of Herman Schoenfield; others in the name of the New York Consoli-
dated Clothiers. A number of invoices for the goods were in the name of
Herman Schoenfield, and a number of them in the name of Max Phillip
Schoenfield. Max was a mere figurehead in the Schoenfield Company. I
have no hesitancy in finding, from the evidence and all the facts and cir-
cumstances connected with the hearing, that Max Phillip Schoenfield and
Herman Schoenfield unblushingly perjured themselves.

Jacob Salsburg's testimony was very unsatisfactory, his manner indicating
that if he were not deliberately perjuring himself, he was withholding some
very important testimony. To illustrate: He said that he had not done any
business with Herman Schoenfield. The examination of his books, which
were introduc 1 by him, to which examination he strenuously objected and
caused a scene at the hearing, showed that there were thousands of dol-
lars of accounts with Herman Schoenfield, one account espcially, the bills
payable account, showing that the firm of Shoeneman & Salsburg had notes
of Herman Schoenfield up in the thousands of dollars, also showing that the
firm of Schoeneman & Salsburg had taken notes of the Schoenfield Com-
pany after it was adjudicated a bankrupt, and had renewed these notes in
the regular course of business and showed a course of dealings with Herman
Schoenfield for years. The account at the German Bank of Wheeling was in
the name of Herman Schoenfield. It was a very active account, and most
of the goods in the store at Wheeling were paid for by Herman Schoenfield's
checks, drawn on this account. The account at the Security Trust Company
at Wheeling was also an active account, and a large part of the goods that
went into the store at Wheeling, before the Schoenfield Company went into
bankruptcy, were paid for by checks drawn on the account in the Security
Trust Company, which was in Herman's name. The proceeds of the sales
at the store in Wheeling were deposited in this account by Herman. The
account at the National Exchange Bank was in the name of Max Schoen-
field. It was not a very active account. It was opened in January, 1910.

Charles H. Sachs and J. B. Handlan, for petitioner Jacob Salsburg.
Benjamin Rosenbloom, for bankrupt.
J. W. Ritz, for trustee.

DAYTON, District Judge (after stating the facts as above). I
have very carefully read and considered all the evidence presented by
this record, set forth as it is, in more than 1,400 typewritten pages,
and some 130 odd exhibits filed therewith. The facts are so many
and complicated I shall not attempt to set them forth in detail, but con-
tent myself with setting forth as above the certificate thereof filed by
the referee.

[1] It is still contended by the petitioner, Salsburg, that the stocks
of merchandise should have been turned over to him by reason of his

alleged purchase thereof from Max Ph. Schoenfield, by the trustee in bankruptcy, whose remedy then would have been the institution of a plenary suit in some court of competent jurisdiction to recover them back from him or their value. I did not think so at the time I entered the order, directing the referee to investigate and determine the validity of this claim of Salsburg, nor do I think so now. On the contrary I think the wisdom of that order, in the light of the remarkable disclosures of the evidence cannot for a moment be questioned.

First. The evidence clearly discloses that the storerooms both in Wheeling and Bay City were the leased premises of Herman Schoenfield; that notwithstanding Salsburg claims to have made his purchase 21 days before Blackford, as receiver, took possession, he allowed the "Schoenfield" signs to remain, and further allowed the bankrupt, Herman Schoenfield, to remain in charge and in a local paper, under date of June 16th, a week before possession was taken by the receiver, to advertise these goods "at bankrupt sale" as belonging to "Schoenfield's store," situate in this storeroom in Wheeling of which Herman was the lessee. The effort to show that the taking into possession of the goods by the receiver was tortious, has, in my judgment, utterly failed. It was a surrender by those in charge with substantially a declaration that Salsburg was the owner by the bankrupt's brother, who had been connected with the "Schoenfield Store" management all along, and by young Salsburg, the son of claimant. It is just as much the purpose of the present bankrupt law (Act July 1, 1898, c. 541, 30 Stat. 544 [U. S. Comp. St. 1901, p. 3418]), as it was that of the Act of 1867 (Act March 2, 1867, c. 176, 14 Stat. 517)—

"to secure the possession of the property of the bankrupt, so that it might be administered under the proceedings in bankruptcy. Between the first steps initiating them and the appointment of the assignee, a considerable time often elapses, during which the effects of the bankrupt, especially in a case commenced by creditors, may be surreptitiously conveyed beyond the reach of the court or of the assignee, who, when appointed, is entitled to the possession of them. If the bankrupt does not voluntarily aid the court, or is inclined to defeat the proceedings, he can, with the aid of friends or irresponsible persons, sell his movable property and put the money in his pocket, or secrete his goods or remove them beyond the reach of the assignee or the process of the court, and thus defy the law." Sharpe v. Doyle, 102 U. S. 686, 689, 26 L. Ed. 277.

The Code of this state (1906) § 3468 (chapter 100, § 13), provides:

"If any person shall transact business as a trader, with the addition of the words 'factor,' 'agent,' 'and company,' or 'and co.,' and fail to disclose the name of his principal or partner by a sign in letters, easy to be read, placed conspicuously at the house wherein such business is transacted, and also by a notice published for two weeks in a newspaper (if any) printed in the town or county wherein the same is transacted, or if any person transact such business in his own name, without any such addition, all the property, stock, choses in action, acquired or used in such business, shall, as to the creditors of any such person, be liable for the debts of such person. This section shall not apply to a person transacting such business under a license to him as an auctioneer or commission merchant."

This provision taken from the Virginia Code of 1860 has been considered in Partlow v. Lickliter, 100 Va. 631, 42 S. E. 671, where it was held that property used in such business is liable for the payment of

the trader's debts, notwithstanding a bill of sale thereof may be recorded.

The Supreme Court of Appeals of this state in the case of Gilbert v. Peppers, 65 W. Va. 355, 64 S. E. 361, has held that a conveyance of a shifting stock of goods or other personal property of a transitory character left in the possession of the grantor is void per se and on its face. This decision has been followed by this court in In re Elletson Company (D. C.) 174 Fed. 859, and its action in so doing has been affirmed by the Circuit Court of Appeals for this circuit in Ritchie County Bank v. McFarland, 183 Fed. 715, 106 C. C. A. 153.

Then, too, section 1, c. 78, of the Acts of the Legislature 1909, was at the time in force, and provides:

"The sale in bulk of any part or the whole of a stock of merchandise otherwise than in the ordinary course of trade and in the regular and usual prosecution of the seller's business, shall be fraudulent and void as against the creditors of the seller, unless the seller and purchaser at least five days before the sale, make a written statement showing the nature and character of the sale and property to be sold and the price to be paid therefor, and unless the purchaser demands and receives from the seller a written list of names and addresses of creditors of the seller, with the amount of indebtedness due or owing to each and certified by the seller under oath, to be, to the best of his knowledge and belief, a full, accurate and complete list of his creditors and of his indebtedness; and unless the purchaser shall at least five days before taking possession of such merchandise or paying therefor, notify personally or by registered mail, every creditor whose name and address is stated in said list, of the proposed sale and of the price, terms and conditions thereof."

Granting that Blackford, receiver, had full notice, by reason of the recordation of Salsburg's bill of sale, of Salsburg's claim to these goods, on its face he must have seen that it was of shifting stocks of merchandise, such as set forth in Gilbert v. Peppers and a very little investigation would have informed him that the "bulk sales" law had not been complied with; that after a lapse of 21 days from the date of such bill of sale, these goods still remained as before under the control of the bankrupt and in his possession, upon his leased premises, and were being advertised and sold, in part, under the old name of the "Schoenfield Store" and in part were being boxed up and shipped to Michigan. Could there be any excuse for his not discharging his duty and taking possession? I think not. Having possession, the law is clear that the bankrupt court's jurisdiction to summarily ascertain and determine Salsburg's title or right to these stocks was complete, as held by such cases as White v. Schloerb, 178 U. S. 542, 20 Sup. Ct. 1007, 44 L. Ed. 1183; Whitney v. Wenman, 198 U. S. 539, 25 Sup. Ct. 778, 49 L. Ed. 1157, and In re Elletson Co. (D. C.) 174 Fed. 859, affirmed in Ritchie County Bank v. McFarland, 183 Fed. 715, 106 C. C. A. 153.

[2] Second. Touching the determination of the merits upon Salsburg's claim to these stocks of goods I have no hesitation in sustaining the conclusions reached by the referee, adverse to such claim, for several very pertinent reasons.

(a) The Supreme Court has held the validity of such claim of title to be a question of local law, in the determination of which state statutes and decisions will control (Thompson v. Fairbanks, 196 U. S.

516, 25 Sup. Ct. 306, 49 L. Ed. 577; Humphrey v. Tatman, 198 U. S. 91, 25 Sup. Ct. 567, 49 L. Ed. 956) ; and I have above shown that this sale in bulk was contrary to chapter 78, Acts 1909; that Salsburg did not comply with section 3468 of the Code 1906, and that this sale ran counter to the rulings in Gilbert v. Pepper.

(b) The claim must be rejected also because it is undisputed that Salsburg claims only through purchase from Max Ph. Schoenfield, who, it is clearly shown, never had title to these goods. Going back only one step, it is to be remembered that the goods were in the possession of the Schoenfield Company, a corporation under the laws of Pennsylvania; that this company became bankrupt; that a composition was offered, accepted and confirmed whereby the stock became vested again in this company; that Max Ph. Schoenfield claims (which claim we will more fully consider later) to have furnished the money to effect this composition, but there was no decree vesting in him the title and possession of the goods and there was no subsequent authorization for or transfer of the goods to him by the corporation. As president of this corporation he could not sell and transfer the stock of goods to himself without the consent of the corporation directors at least.

[3] The result was he could acquire no title as against the corporation by merely taking possession and by reason of such possession could sell and confer no title at least to any other than an innocent purchaser without notice and such Salsburg certainly was not; for

(c) The whole proceeding had been, in my deliberate judgment, a corrupt scheme originated by Herman Schoenfield, the bankrupt, and Salsburg to secure the debts due to Salsburg's firms and to defraud the other creditors. This is shown by the fact that Salsburg first obtained the guarantee agreements from Max Ph. Schoenfield, that his firms' debts should be paid; that his two firms then became two of the three petitioning creditors, asking for and obtaining this corporation's adjudication in bankruptcy; that Salsburg or one of his firms loaned nearly $6,000 to effect the 20 per cent. composition; that while this loan was nominally to Max it was largely repaid to him by Herman.

Max has testified that he was a "figurehead" in the Schoenfield Company, and I think there can be no question that this was true. The company itself, in my judgment, has been clearly shown to have been nothing more and nothing less than a mere device to enable Herman to carry on business which he could not do because his effort to defraud creditors by the bankrupt proceedings at Youngstown, Ohio, had failed and he was an undischarged bankrupt. Max and Herman, it seems, just before this attempted sale to Salsburg had fallen out and Max had left Wheeling. It seems clear he wanted to return to Europe. Doubtless he needed money. Herman sent for his friend Salsburg who came on to help out. Max was paid substantially $1,000 to quit, and this bill of sale was made to Salsburg with the strong presumption arising that Herman hoped to get free by this new proceeding in bankruptcy in this court, and then be able to run another course of unparalled fraudulent and corrupt business transactions, in the meanwhile "managing" the goods in Salsburg's name, selling them out quickly by rea-

son of false advertising, realizing and paying Salsburg and his firms their debts in full, while the other creditors got nothing. Herman it seems was a valuable man to Salsburg, for the latter, in one of his letters "takes off his hat" to him in admiration of his qualities as a "hustler" in selling and disposing of goods.

[4] I do not deem it necessary to consider the contention of counsel for Salsburg, that if Herman was the true owner, yet allowed credit to be extended to Max, there would be an estoppel in favor of those who had extended such credit to Max as against Herman and his trustee, further than to say that such question cannot be raised by Salsburg, but only by the persons themselves who have been so innocently defrauded. Salsburg certainly was not so innocently defrauded, but was a party to the scheme by which it was done.

[5] The bankrupt under oath has listed in his schedules debts to the amount of $14,000 and declared himself to have no assets, therefore it was not incumbent upon the trustee in his petition to allege, nor, by evidence prove, "that he has not sufficient assets in his hands to satisfy' the claims of the creditors of Herman Schoenfield, bankrupt."

I affirm the conclusion reached by the referee that these two stocks of goods were properly taken in charge by Blackford, receiver and trustee, and must be held liable for the payment of bankrupt's debts, and that Salsburg's petition must be dismissed, and he be required to pay the costs of its defense.